**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*IN RE SUBPOENA OF JAMES COMEY BY*
*AUTHORITY OF THE HOUSE OF*
*REPRESENTATIVES OF THE CONGRESS OF THE*
*UNITED STATES OF AMERICA*

Miscellaneous Case No.

**MOTION AND MEMORANDUM IN SUPPORT BY JAMES B. COMEY TO QUASH**
**THE CONGRESSIONAL SUBPOENA**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF FACTS ........................................................................................ 1

ARGUMENT ........................................................................................................... 3

     I.      JUDICIAL INTERVENTION TO QUASH THE SUBPOENA IS
            APPROPRIATE AND WARRANTED ............................................... 5

           A.     The Joint Committees' Closed Interview Condition Enables
                 Selective Leaks, Is Abusive To Witnesses, And Furthers No
                 Legitimate Congressional Purpose .......................................... 6

           B.     The Joint Committees' Secret Interviews Violate House Rules ................ 8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gojack v. United States,*
    384 U.S. 702 (1966)................................................................................6

*Hentoff v. Ichord,*
    318 F. Supp. 1175 (D.D.C. 1970)..........................................................6

*Liveright v. United States,*
    347 F.2d 473 (D.C. Cir. 1965)...............................................................6

*McGrain v. Daugherty,*
    273 U.S. 135 (1927)...............................................................................5

*United States v. Grumman,*
    227 F. Supp. 227 (D.D.C. 1964).............................................................6

*Watkins v. United States,*
    354 U.S. 178 (1957)...........................................................................5, 8

*Yellin v. United States,*
    374 U.S. 109 (1963)...............................................................................6

**Rules**

*Rules of the  United States House of Representatives,*
    R. XI clause 2(g)(2) (115th Congress)....................................................9

*Committee on the Judiciary of the United States House of Representatives*
*Rules of Procedure,* R. III(b) ......................................................................9

*Committee on Oversight and Government Reform of the United States*
*House of Representatives,* R. IX(a)..............................................................9

**Other Authorities**

CNBC...................................................................................................7

CNN.................................................................................................6, 7

Fox News ..............................................................................................7

The Hill ................................................................................................7

New York Times...................................................................................10

James B. Comey respectfully submits this motion and memorandum in support to quash the congressional subpoena. As set forth below, the subpoena, which calls for a closed, non-public deposition of Mr. Comey, exceeds a proper legislative purpose, is issued in violation of House rules, and unduly prejudices and harasses the witness. This motion is accompanied by a related motion to stay any proceedings thereunder until this motion may be heard.

## STATEMENT OF FACTS

On November 21, 2018, the Committee on the Judiciary of the United States House of Representatives ("Judiciary Committee") served James B. Comey, the former Director of the U.S. Federal Bureau of Investigation ("FBI"), with a subpoena requiring Mr. Comey's testimony at a closed-door deposition on December 3, 2018 at the Rayburn House Office building in Washington, D.C. *See* Exhibit A.

Mr. Comey previously had been informed by counsel to the Judiciary Committee, in or about September 2018, that the Judiciary Committee, together with the House Committee on Oversight and Government Reform (the "Joint Committees"), were conducting a joint inquiry into two separate investigations previously conducted by the FBI and Department of Justice ("DOJ"): the investigation of certain conduct of former Secretary of State Hillary Clinton, and the investigation of allegations of possible Russian interference in the 2016 Presidential election (the "Joint Committees' Investigation"). Counsel noted in particular that the Joint Committees intended to ask Mr. Comey questions about the FBI and DOJ's investigations of Secretary Clinton's handling of classified materials, her use of private email servers, and other matters concerning the 2016 election, as well as the FBI and DOJ's subsequent recommendation that Secretary Clinton not be prosecuted. *See* Exhibit B.

In subsequent correspondence from Judiciary Chairman Bob Goodlatte and Chairman Trey Gowdy of the Committee on Oversight and Government Reform, dated September 21, 2018, Mr. Comey was requested to appear voluntarily for a closed-door transcribed interview by the Joint Committees concerning "decisions made and not made by the FBI and DOJ during the 2016 election." *See* Exhibit C.

In a letter dated October 1, 2018, Mr. Comey notified the Joint Committees that he would decline their invitation to sit for the proposed private interview but that he welcomed the opportunity to provide sworn testimony at a public hearing regarding the subject matters of the Joint Committees' Investigation. *See* Exhibit D. The Joint Committees acknowledged receipt of the October 1 letter, but made no further response until the subpoena was issued on November 21. *See* Exhibit D.

Mr. Comey, who was appointed by President Obama, served as Director of the FBI from September 4, 2013, until he was fired by President Trump on May 9, 2017. While FBI Director, Mr. Comey oversaw, among numerous other investigations, the investigations of Secretary Clinton's handling of classified emails and of alleged Russian interference with the 2016 general election (the "Clinton and Russian investigations"). While FBI Director, and after his tenure as Director, Mr. Comey provided testimony or closed-door briefings on these matters on numerous occasions to, among others, the House Oversight and Government Reform Committee (July 7, 2016), House Judiciary Committee (September 28, 2016), House Permanent Select Committee on Intelligence (March 20, 2017), United States Senate Committee on the Judiciary (May 3, 2017), and the Senate Select Committee on Intelligence (June 8, 2017). In addition, while serving as Director, Mr. Comey met on several occasions with full Senate and House intelligence

committees as well as with chairs and ranking members of those committees to provide classified briefings regarding the Russian investigation.

While Mr. Comey served as FBI Director, he possessed numerous security clearances in order to handle classified information lawfully.  As is customary for departing federal officials, Mr. Comey relinquished all of his clearances and was "read out" of all the classified compartments and programs to which he had access as Director in or about August 2017, notwithstanding President Trump's announcement, many months later in July of 2018, that he intended to strip Mr. Comey of all of his clearances.  When Judiciary Committee Counsel first contacted Mr. Comey regarding the requested closed-door interview, counsel indicated that, for purposes of the interview Mr. Comey would be given a temporary or "provisional" clearance so that he could discuss classified information therein.

## ARGUMENT

Mr. Comey asks this Court's intervention not to avoid giving testimony but to prevent the Joint Committee from using the pretext of a closed interview to peddle a distorted, partisan political narrative about the Clinton and Russian investigations through selective leaks.  That corrosive narrative is familiar – that Secretary Clinton committed serious crimes and was given unwarranted leniency by an FBI and DOJ that were loyal to her and her party, and that President Trump has, by contrast, been saddled with unwarranted scrutiny, for purely partisan political reasons, by that same FBI and DOJ.  And it draws sustenance from a poisonous combination of presidential tweets and the selective leaking that has become standard practice for the Joint Committees.  The broader purpose of these tweets and leaks appears to be to mislead the public and to undermine public confidence in the FBI and the DOJ during a time when President Trump

and members of his administration and campaign team are reported to be under investigation by Special Counsel Robert Mueller and other law enforcement authorities.

The public record shows members of the Joint Committees leaking what suits them and maintaining the secrecy only of what does not. Witnesses who appear before the Joint Committees are powerless to counter or contextualize the distortions of their testimony that are leaked to the press and the full scope of their testimony is kept from public view for reasons known only to members of the Joint Committees. Mr. Comey may lack standing to complain about the grievous harm that the Joint Committees' practice has done to public discourse on matters of grave national concern, but he very much has standing to challenge the Joint Committees' plan to make him the next victim of their unauthorized and abusive tactics.

Mr. Comey welcomes the opportunity to testify publicly about the Clinton and Russian investigations as he has done previously numerous times. He does not shy from public accountability for his time as Director of the FBI. To be clear, the FBI and DOJ are appropriately subject to congressional oversight, and the subject matters of the Joint Committees' Investigation are appropriate subjects of a proper investigation. Mr. Comey should not be forced, however, to testify under the circumstances and conditions imposed by the Joint Committees, which conditions – particularly given the Committee's history of selective leaking – lack any legitimate congressional purpose and would instead enable precisely the sort of harassment the case law condemns. Mr. Comey should not be coerced into participating in an improper and partisan effort to undermine the legitimacy of an institution that he served for the better part of four years. Moreover, a closed interview of the kind proposed by the Joint Committees is contrary to Congress' presumption that congressional proceedings be open to the public. There is no legitimate reason why Mr. Comey cannot provide sworn, live public

testimony about the matters under investigation; given the Joint Committees' track record of leaks from prior closed-door depositions, the Joint Committees cannot credibly invoke the need to protect the sensitive nature of the information developed in those closed sessions to overcome the general presumption of congressional openness and transparency.

For the reasons set forth below, Mr. Comey asks this Court to quash the Joint Committees' subpoena in its current form, and will decline any request that he be "read in" to classified material for the purposes of testifying at this or any other closed interview.

## I.    JUDICIAL INTERVENTION TO QUASH THE SUBPOENA IS APPROPRIATE AND WARRANTED

Although congressional investigations are due significant deference from the courts, *McGrain v. Daugherty*, 273 U.S. 135, 178 (1927), that deference has limits, and we respectfully submit that those limits have long since been reached.  Courts have intervened in the conduct of congressional investigations in two limited circumstances: 1) where congressional authority was abused to harass and intimidate witnesses, and 2) where Congress has broken its own rules in the conduct of an investigation.  The Joint Committees' abusive conduct of this investigation to date and the secret proceedings held pursuant thereto, in betrayal of House rules that presume proceedings be open to the public, present both circumstances.  Therefore, judicial intervention to quash this subpoena is warranted.

In *Watkins v. United States*, 354 U.S. 178 (1957), in the context of the hearings conducted by Senator Joseph McCarthy in the late 1950s in which suspected communists were brought before congressional committees for the sole purpose of being identified as communists, the Supreme Court held that, while "[t]he public is of course entitled to be informed concerning the workings of government, [t]hat cannot be inflated into a general power to expose." *Id.* at 200.  Similarly, this Court later held that if a congressional subpoena "is issued solely for sake of

exposure or intimidation, then it exceeds the legislative function of Congress." *Hentoff v. Ichord*, 318 F. Supp. 1175, 1182 (D.D.C. 1970).

In the same context of McCarthyism, the Supreme Court overturned a congressional contempt conviction because the proceeding in which the alleged contempt took place violated House rules. *See Yellin v. United States*, 374 U.S. 109 (1963) (finding that House rules are written principally for the protection of witnesses and petitioner had the right to enforce them). *Yellin* has been consistently followed for the proposition that congressional conduct in violation of its own rules is subject to challenge in the courts. *See, e.g., Gojack v. United States*, 384 U.S. 702 (1966); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965); *United States v. Grumman*, 227 F. Supp. 227 (D.D.C. 1964).

A.   **The Joint Committees' Closed Interview Condition Enables Selective Leaks, Is Abusive To Witnesses, And Furthers No Legitimate Congressional Purpose**

The abusive pattern of selective leaking by the Joint Committees is by now clearly established, and was in fact recently acknowledged by the Chair of one Committee.  Over the preceding months, the members of the Joint Committees have consistently leaked the ostensibly secret testimony of many – if not all – of the witnesses who have come before them.  For example:

> **Andrew McCabe**: McCabe, the former FBI Deputy Director from 2016-2018, testified in closed session before the Joint Committees on or about December 21, 2017.  Shortly after he testified, CNN reported, that McCabe purportedly "told lawmakers that Comey informed him of conversations he had with President Donald Trump soon after they happened," including "[t]he January dinner where Trump asked for loyalty, and the February meeting where Trump asked Comey to go easy on former national security adviser Michael Flynn, who was under FBI investigation."  The article went on to report that two Republicans emerged from the hearing "saying McCabe's testimony did not change their belief that Clinton got favorable treatment by the FBI when it decided not to pursue criminal charges over the handling of her private email server.  The two Republicans reportedly declined to provide details about what McCabe said, citing the confidential nature of the interview," but that apparently did not stop them from commenting about it.  *See* Exhibit G.

**Peter Strzok**: Strzok, a former Senior Official in FBI's Counterintelligence Division, testified in closed session before the Joint Committees on or about June 27, 2018. Shortly after he testified, CNN reported that, during the interview, Strzok was asked how Special Counsel Robert Mueller had reacted to Strzok's "anti-Trump texts." According to "four sources from both parties," Strzok testified that Mueller did not press him about texts when they came to light.

Representative Meadows claimed after Strzok's testimony "I don't know how any reasonable person reads the texts and concludes there was not bias." *See* Exhibit J.

**Lisa Page**: Page, a former legal counsel to McCabe, testified in closed session before the Joint Committees on or about July 13, 2018. Shortly after she testified, The Hill reported quotes from Rep. John Ratcliffe of Page's private testimony that "In many cases, she admits that the text messages mean exactly what they say, as opposed to agent Strzok, who thinks we have all misinterpreted his own words on any text message that might be negative." *See* Exhibit K.

Representative Meadows also commented that Page's testimony was contradictory to other witness' testimony. *See* Exhibit K. Representative Louis Gohmert said "[M]ake no mistake . . . she's a Democrat. She wanted Hillary to win and she did not want Trump to win, and that's been obvious." *See* Exhibit L.

**Jonathan Moffa:** Moffa, an FBI Intelligence Analyst, testified before the Joint Committee in closed session on or about August 24, 2018. Shortly after his testimony, Fox News reported that a source with knowledge of the testimony initially told Fox News that Moffa said FBI personnel would use media reports based on information they leaked to justify applications for Foreign Intelligence Surveillance Act warrants. The source said Moffa, who worked with controversial former FBI officials Peter Strzok and Lisa Page, acknowledged this 'had been a practice in the past." But after an FBI official disputed that claim, the source clarified that Moffa testified the FBI routinely uses media material to corroborate their work product, including FISA materials, but "never said directly 'we utilize FBI leaks for FISAs.' " *See* Exhibit E.

**Bruce Ohr**: Ohr, a Justice Department Lawyer, testified in closed session before the Joint Committees on or about August 28, 2018. Shortly after he testified, CNBC reported that an anonymous source said that Ohr learned from Christopher Steele that an unnamed former Russian intelligence official said Russian intelligence believed "they had Trump over a barrel." *See* Exhibit H.

Representatives Matt Gaetz, Mark Meadows, and Darrell Issa informed reporters that Ohr's testimony conveyed the FBI had "more significant doubts about the credibility of the Steele dossier than the bureau revealed." *See* Exhibit I.

**James Baker**: Baker, the FBI's General Counsel from 2014 to 2017, testified in closed session before the Joint Committees on or about October 18, 2018. Shortly after he testified, The Hill reported that, according to GOP lawmakers, Baker said "he believes

Deputy Attorney General Rod Rosenstein was serious when he told other officials he was considering wearing a wiretap during an Oval Office meeting with President Trump last year following Trump's firing of then-FBI director James Comey." *See* Exhibit F.

These leaks and related comments by Committee members, which purport to portray the testimony of the witnesses, while preventing the full scope of said testimony from being known to the public, unfairly prejudiced these witnesses and hardly served the supposed truth-seeking purpose of the Joint Committees' Investigation. Indeed, the track record of this particular investigation is so remarkable that even Chairman Gowdy acknowledges that the leaks call into question the legitimacy of the investigation. In televised remarks on November 25th, Chairman Gowdy acknowledged that Mr. Comey was right to be concerned about leaks:

> I don't get a chance to say this very often, but I do think Jim Comey is right. Leaks are counterproductive whether Jim Comey is doing it, whether the FBI is doing it, or whether Congress is doing it … I am sensitive to leaks. I hate leaks. I think they undercut the- the authenticity of the investigation ….[1]

The congressional committee abuse condemned in *Watkins*, took the form of unfairly prejudicial light trained on a witness. Here, the form will be a shadow on the witness but bright lights for the Committee member who seeks partisan advantage by peddling a misleading account of the witness's testimony. In neither case is a proper legislative purpose or simple fairness to the witness served. This cannot be tolerated. As the Court observed in *Watkins*, "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." 354 U.S. at 187.

## B.     The Joint Committees' Secret Interviews Violate House Rules

The obvious way to eliminate selective and inaccurate leaks and to curb the potential for abusive conduct by the Joint Committees is to make these proceedings open to the public. Public

---

[1]     *See* Exhibit M.

access to congressional investigations is the norm, not the exception. The House operates under the presumption that its proceedings be open to the public, and Rules of the House generally require as much. *See Rules of the House of Representatives*, R. XI clause 2(g)(2) (115th Congress) ("Each hearing conducted by a committee or subcommittee . . . shall be open to the public, . . ."); *Committee on the Judiciary, Rules of Procedure,* R. III(b); *Committee on Oversight and Government Reform*, R. IX(a). Exceptions to the presumption of openness arise only when the testimony would endanger national security, compromise sensitive law enforcement information, or would tend to defame, degrade, or incriminate any person. *Id.*

None of these exceptions genuinely applies here, the Joint Committees' insistence to the contrary notwithstanding, and accordingly the command to appear for a closed interview is incompatible with the House rules.[2] The clear pattern of leaks and other comments by members of the Joint Committees make plain that the request for secrecy in these interviews is not about secrecy, but a mechanism to permit selective and biased exposure of testimonial snippets that appear to support a political narrative while at the same time withholding from view any testimony that undermines that narrative. Viewed in this light, where Committee Members themselves clearly feel no obligation to abide by the secrecy of the interviews, the Joint Committees' invocation of the need for secrecy is clearly pretextual.

To the extent that the Joint Committees' purported need for secrecy arises from concern that classified subject matters will be addressed, arrangements can easily be made to balance the

---

[2]    As Representative Gowdy stated on November 25, 2018, one reason for the closed-door interview process of the Joint Committee Investigation is logistical – that conducting a hearing about "17 months worth of decision making [by FBI and DOJ]" cannot be undertaken effectively if the hearing was open to all members of both committees who would then each be limited to five minutes of questions for the witness. *See* Exhibit M. However unwieldy that process may be, it is a problem that the Committees need to resolve without forsaking the public's right to know unfiltered testimony.

presumption of openness with the need to protect such information. The bulk of the deposition can, for instance, occur in an open session, with classified matters – if any – postponed to the end of the hearing, when they can be addressed in a limited, closed session. In any event, Mr. Comey would refuse to accept a temporary clearance in the context of a fully closed interview, and there is no precedent that gives the House the authority to compel Mr. Comey to accept one.

Mr. Comey's refusal is well considered. On numerous occasions, Mr. Comey has been falsely accused of leaking classified information.[3] He has no desire to testify in secret where he has a reasonable concern that such testimony could potentially expose him to further scurrilous allegations that he has made unauthorized disclosures of classified information.

Last, and most obviously, Mr. Comey has communicated to the Joint Committees numerous times that he would welcome the opportunity to testify in a public setting concerning the Russia and Clinton investigations. As detailed above, Mr. Comey has already provided substantial public testimony about these subjects. The secrecy of these sessions is clearly not designed for the protection or benefit of the witness.

Because the need for secrecy here is pretextual, because the Joint Committees have abused their powers with selective leaks, and because Mr. Comey is willing to testify in public, the Joint Committees' insistence that Mr. Comey appear in private should be closely scrutinized to determine whether the exception to the presumption of openness applies. Even the most limited scrutiny reveals that the Joint Committees' preference for closed testimony over public testimony by Mr. Comey furthers no legitimate purpose and is unfair to the witness. Because of

---

[3]     In fact, the *New York Times* reported on November 20, 2018 that, as recently as the spring of 2018, President Trump told White House counsel that he wanted to prosecute Mr. Comey, for among other things, leaking classified information. The *Times* also reported in the same article that there was no evidence that Mr. Comey had, in fact, disclosed classified information. *See* Exhibit N.

this abuse, and because no legitimate purpose is served by the secrecy of the testimony, the subpoena must be quashed.

For the foregoing reasons, we respectfully ask that the Court grant this Motion to quash the congressional subpoena and stay the proceedings thereunder.

Dated: November 29, 2018

Respectfully submitted,

Vincent Cohen (No. 471489)
D. Brett Kohlhofer (No. 1022963)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-3333
Vincent.Cohen@dechert.com

David N. Kelley*
Jeffrey Brown*
Kaitlyn N. Walsh*
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3580
Facsimile: (212) 698-0460
David.Kelley@dechert.com

*Attorneys for James B. Comey*

*Pro Hac Vice Admission to be Requested*